<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-2151

                         UNITED STATES,
                      Plaintiff, Appellee,

                               v.

                RALPH ROSARIO-DIAZ, A/K/A JUNI,
                     Defendant, Appellant.

                      ____________________

No. 98-2152

                         UNITED STATES,
                      Plaintiff, Appellee,

                               v.

                     WILSON MONTALVO ORTIZ,
                      A/K/A WILLIE BARBER,
                     Defendant, Appellant.

                      ____________________

No. 98-2153

                         UNITED STATES,
                      Plaintiff, Appellee,
                                 
                               v.

                   JUAN ANTONIO BAEZ-JURADO,
                          A/K/A PAPO,
                     Defendant, Appellant.

                      ____________________

No. 98-2328

                         UNITED STATES,
                      Plaintiff, Appellee,

                               v.

                    WILFREDO LOPEZ-MORALES,
                     Defendant, Appellant.

                      ____________________

No. 99-1015

                         UNITED STATES,
                      Plaintiff, Appellee,

                               v.

                      ADA MELENDEZ-GARCIA,
                     Defendant, Appellant.

                      ____________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Daniel R. Domnguez, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

          Campbell and Wallace, Senior Circuit Judges.

                     _____________________

   Rachel Brill and Bruce J. McGiverin, by appointment of the
Court, were on consolidated brief, for appellants Ralph Rosario-
Daz and Wilson Montalvo-Ortiz.
   Lydia Lizarribar-Masini and Ramn Garca, by appointment of
the Court, were on consolidated brief, for appellants Juan Antonio  
Bez-Jurado and Ada Melndez-Garca.
   Vilma Mara Dapena, by appointment of the Court, with whom
Dapena & Dapena Law Offices was on brief, for appellant Wilfredo
Lpez-Morales.
   Sonia I. Torres, Assistant United States Attorney, with whom
Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco,
Chief, Criminal Division, and Camille Vlez-Riv, Assistant United
States Attorney, were on brief, for appellee.

                      ____________________

                        January 31, 2000
                      ____________________

        TORRUELLA, Chief Judge.  Ralph Rosario-Daz, Wilson
Montalvo-Ortiz, Ada Melndez-Garca, Juan Bez-Jurado, and  
Wilfredo Lpez-Morales were each convicted on both counts of a
grand jury indictment charging them with (1) aiding and abetting
each other in a carjacking that resulted in the death of the
victim, in violation of 18 U.S.C.  2 & 2119(3); and (2)
conspiring to commit that carjacking, in violation of 18 U.S.C.
371.  The district court sentenced each defendant to life in
prison on each count, the sentences to run concurrently.  All five
defendants now appeal.
 Because we hold that appellants Rosario-Daz and
Montalvo-Ortiz did not have the requisite foreknowledge that a
carjacking crime was to be committed, their convictions must be set
aside.  We affirm the convictions of appellants Melndez-Garca,
Bez-Jurado, and Lpez-Morales, although we remand for resentencing
on their conspiracy convictions.
                         I.  BACKGROUND
 A.  The Conspiracy and the Carjacking
 On June 9, 1995, defendants Ralph Rosario-Daz and Wilson
Montalvo-Ortiz placed a telephone call to Gregorio Aponte-Laz, who
would later be a codefendant in this case and ultimately the
government's star cooperating witness.  Rosario-Daz informed
Aponte-Laz that Aponte-Laz's brother-in-law, Fonsi, a runner in
Rosario-Daz's drug ring, had been killed the preceding day.  
Rosario-Daz told Aponte-Laz that among Fonsi's belongings had
been found a list of persons who they believed to have Fonsi's drug
money.  The list included the name of Edna Rivera-Hernndez.
 Rosario-Daz told Aponte-Laz that he had a job for him--
to find Edna and retrieve the $200,000 she was thought to have.  In
exchange, Aponte-Laz would receive $25,000.  If Edna should refuse
to return the money, Aponte-Laz was to kill her and make it look
like a robbery.  To facilitate the crime, Rosario-Daz provided
Aponte-Laz with several pieces of information, including Edna's
address, the color and make of her car, as well as some of the
numbers of the car's license plate.  He also told Aponte-Laz that
Edna studied at the American City College (ACC), where Rosario-Daz
and Montalvo-Ortiz worked.
 On Tuesday, June 13, 1995, Rosario-Daz pointed Edna out
to Aponte-Laz at the ACC.  At that point, Rosario-Daz, Montalvo-
Ortiz, and Aponte-Laz discussed the planned participation of
defendant Juan Bez-Jurado.  Rosario-Daz explained that Aponte-
Laz was to meet Bez-Jurado the following Friday, June 16, 1995.  
Montalvo-Ortiz instructed Aponte-Laz not to rape Edna, but stated
that he should kill her if necessary.
 On Friday, June 16, 1995, as planned, Aponte-Laz met
Bez-Jurado in a local plaza.  With Aponte-Laz was defendant Ada
Melndez-Garca, who also knew Bez-Jurado.  The three agreed that
they would carry out their contract on Tuesday, June 20, 1995.  
Bez-Jurado agreed to bring a firearm.
 On the appointed day, Aponte-Laz met in the plaza with
Melndez-Garca, who had her son with her due to a field day at the
elementary school.  Aponte-Laz then went to the ACC, where
Rosario-Daz informed him that Edna would be at a doctor's
appointment that day, rather than at the college.  Aponte-Laz
expressed his feeling that the crime would therefore be easier,
because they would not have to go to Edna's house.  Montalvo-Ortiz,
however, warned Aponte-Laz to be careful because a law enforcement
drug division was located near the doctor's office.
 Aponte-Laz and Melndez-Garca returned to the town
plaza, where Bez-Jurado was waiting with defendant Wilfredo Lpez-
Morales, whom Melndez-Garca said she knew.  Bez-Jurado informed
them that he had not brought a weapon as they had planned.  The
five of them, Aponte-Laz, Melndez-Garca, her son Victor, Bez-
Jurado, and Lpez-Morales, then walked the streets near the plaza.  
They saw Edna, who got out of her car and entered a pediatrician's
office with her four-month-old baby.  Aponte-Laz and the others
went to a nearby supermarket and purchased a knife.
 Eventually, Edna exited the doctor's office and moved
towards her car, pushing her baby in a stroller.  Aponte-Laz,
Melndez-Garca, and Vctor approached the car at the same time as
Edna, complimenting and inquiring about her baby.  When Edna had
placed her car key in the car door, Aponte-Laz put the knife to
her ribs.  Bez-Jurado and Lpez-Morales appeared, and Edna was
forced into the back seat with them and Vctor.
 Aponte-Laz drove the car away from the plaza.  From
Edna's purse, appellants removed twenty-six dollars in cash and a
bank card, the access code for which Edna divulged before she was
killed.  Aponte-Laz asked Edna for the $200,000, but she responded
that she did not have it and that she had returned it to Fonsi
before he was killed.  At Aponte-Laz's instruction, Melndez-
Garca then slapped Edna.
 After leaving the plaza area, Aponte-Laz stopped to
purchase crack, marijuana, and heroin.  Aponte-Laz, Bez-Jurado,
and Lpez-Morales consumed the drugs in the car as they drove.  
Meanwhile, they continued to slap Edna and threatened to kill her
baby.
 Near the Guayanez River, the car became stuck in a sugar
cane bank, and Aponte-Laz, Bez-Jurado, Lpez-Morales, and Edna
exited the car.  While Melndez-Garca sat in the car with Edna's
baby, the rest of the group went to a secluded area surrounded by
bamboo trees, and Edna was ordered to sit on a towel.  While Edna
protested that she had returned all the money, she was asked
intimate questions by Aponte-Laz while Bez-Jurado wielded the
knife.  Aponte-Laz, Bez-Jurado, and Lpez-Morales then each raped
Edna and even placed young Vctor on top of her naked body in a
grotesque simulation of their acts.
 After the rapes, Edna was ordered to put her clothes back
on.  While threatening to kill her baby, Aponte-Laz, Bez-Jurado,
and Lpez-Morales beat Edna with their fists and with a bamboo
stick.  Aponte-Laz then ordered Lpez-Morales to drag Edna to the
river, presumably to drown her.  When Edna resisted, Aponte-Laz
told Bez-Jurado to help.  Bez-Jurado entered the river and slit
Edna's throat.  They left her body in the river, where it was found
decapitated on July 7, 1995.
 After killing Edna, Aponte-Laz and appellants managed to
extract the car from the sugar cane bank and fled the area.  
Aponte-Laz telephoned Rosario-Daz and informed him that Edna was
dead but that they still had her car and her baby.  Rosario-Daz
instructed them to leave the car and baby at a safe place.
 Aponte-Laz and Melndez-Garca attempted unsuccessfully
to use Edna's bank card at a retail store.  Aponte-Laz and
appellants then drove to the city of Gurabo, where Aponte-Laz was
able to withdraw seventy dollars from Edna's account.
 Aponte-Laz and the appellants next drove to Caguas
Central, where Edna's baby began to cry.  When Melndez-Garca
tried to feed the baby some juice, it choked.  Aponte-Laz and
appellants drove to the Caguas Municipal Hospital, where the baby
was examined and released.  When Aponte-Laz and Melndez-Garca
exited the hospital, however, Bez-Jurado had left the group.  The
remaining four proceeded to Melndez-Garca's house, where
Melndez-Garca bathed and fed the baby.
 Later that evening, Aponte-Laz and Lpez-Morales drove
the baby to Luquillo.  On the way, they had a minor accident, but
they finally arrived in Luquillo, where the baby was abandoned in
front of a residence.
 That same evening, Edna's husband and his brother began
to search for Edna.  On the highway, they spotted her car, driven
by Aponte-Laz, and gave chase.  Edna's husband was able to turn
off the ignition of Edna's car using a spare remote control for the
car's alarm system.  When Edna's car stopped, Aponte-Laz ran away
but was apprehended by the husband and his brother.  Edna's ring
and bracelet were found on Aponte-Laz's person.  When the police
arrived, the knife and a photo of Aponte-Laz were found in Edna's
car.
 B.  The Investigation and Trial
 On June 15, 1995, after being apprehended by Edna's
husband, Aponte-Laz gave the first of several inconsistent
statements to law enforcement.  Among those statements was the
assertion that Lpez-Morales had had nothing to do with the crime,
which the government claimed at trial was made in an attempt to
gain the release of Lpez-Morales so that Lpez-Morales could
murder the government's witnesses.  Subsequent to his guilty plea
in July of 1995, Aponte-Laz began to divulge the details of the
crime to investigators.
 On June 25, 1995, FBI agents conducted a consent search
of Melndez-Garca's residence and found various items tied to the
abduction of Edna.  After waiving her rights, Melndez-Garca made
a statement admitting some knowledge of the crime but in general
denying direct involvement.  The following day Melndez-Garca gave
a second statement detailing the crime and admitting her
involvement.  She attempted to lead the police to the body but
could not find the scene.
 On June 28, 1995, the FBI interviewed Bez-Jurado, who
claimed that Melndez-Garca had told him what had happened to Edna
and where her body had been left.  Bez-Jurado also attempted to
lead the police to the crime scene but could not locate it.
 On June 28, 1995, Lpez-Morales was also interviewed.  He
denied knowing Melndez-Garca or anything about Edna or her
disappearance.
 On May 6, 1996, a grand jury returned a two-count
indictment charging Aponte-Laz, Melndez-Garca, Bez-Jurado,
Lpez-Morales, Rosario-Daz, and Montalvo-Ortiz with (1) aiding and
abetting each other in the commission of a carjacking in violation
of 18 U.S.C.  2 & 2119(3), and (2) conspiracy to commit that
carjacking, in violation of 18 U.S.C.  371.  All defendants
initially pled not guilty, although Aponte-Laz subsequently
changed his plea and agreed to cooperate with the United States.
 Before trial, appellants Melndez-Garca, Montalvo-Ortiz,
Bez-Jurado, and Rosario-Daz filed motions to suppress evidence.  
Hearings were held on two of the motions, and all of the motions
were denied.
 At trial, the prosecution's star witness was Aponte-Laz,
who testified extensively about the details of the crime and the
participation of each defendant.  Immediately after the testimony
of Aponte-Laz, the United States put FBI agent Daryl Huff on the
witness stand.  Over the objection of defense counsel, Agent Huff
testified at length about his interactions with Aponte-Laz during
the investigation of the carjacking and murder of Edna.  Agent Huff
testified as to the interrogation techniques used with Aponte-Laz,
as to the statements made by Aponte-Laz, and even as to how law
enforcement evaluated the veracity and reliability of Aponte-Laz's
statements.  For example, Agent Huff identified omissions and
falsities in Aponte-Laz's statements:
          A:     Specifically with regards to why he
        traveled to Caguas, one of the lies.  
        And also specifically about the rape.  
        He had not mentioned that.  And he also
        omitted the fact that Wilson Montalvo
        Ortiz and Ralph Rosario Daz were
        involved in the carjacking or
        conspiracy of the carjacking fully.  
        So, those were three of the lies.
          Q:     Okay.  Now, how were those omissions
        discovered?
          A:     Again through interview and through
        seeing the discrepancies,
        inconsistencies and just things that
        didn't make sense in the statement.  It
        became pretty obvious in most cases.

                         . . . .

          Q:     And did you use or need a
        polygraph in order to do
        that?
          A:     No, a polygraph is a last resort
        technique.  There was no need for a
        polygraph in the particular situation.  
        We were pinning him down without a
        polygraph.  We could tell when he was
        lying.

Tr. of Nov. 25, 1995, at 22.  Other trial testimony included expert
testimony on the mental capacity of Melndez-Garca.
 On December 12, 1997, after twenty-three days of trial,
a jury found each defendant guilty on both counts of the
indictment.  Rosario-Daz and Montalvo-Ortiz filed a motion for a
new trial, which all appellants joined; a hearing was held, and the
district court denied the motion.
 On August 27, 1998, appellants Rosario-Daz and Montalvo-
Ortiz were given life sentences on each count, to be served
concurrently.  Bez-Jurado was given the same sentence the
following day, and Lpez-Morales and Melndez-Garca received the
same sentences on October 30, 1998 and November 13, 1998,
respectively.  All appellants filed timely notices of appeal.
                    II.  LAW AND APPLICATION
 Appellants now challenge their convictions and sentences
on a number of grounds.  We begin with the joint arguments of
appellants Rosario-Daz and Montalvo-Ortiz.
 A.  Rosario-Daz and Montalvo-Ortiz
 Although appellants Rosario-Daz and Montalvo-Ortiz raise
several issues on appeal, we find it necessary to reach only one--
whether the evidence presented to the jury was sufficient to
support guilty verdicts on Counts One and Two.  We review a
district court's Rule 29 determinations de novo.  See United States
v. Hernndez, 146 F.3d 30, 32 (1st Cir. 1998).  Because we find
that there was not sufficient evidence that Rosario-Daz and
Montalvo-Ortiz had the knowledge required to support a conviction
for aiding and abetting a carjacking, we reverse their convictions
on Count One.  Similarly, we reverse their convictions on Count Two
because the government failed to introduce evidence sufficient to
establish that Rosario-Daz and Montalvo-Ortiz conspired to
carjack.
 1.  Count One
 Rosario-Daz and Montalvo-Ortiz claim that the evidence
submitted at trial failed to prove that they had "foreknowledge"
that Aponte-Laz would carjack Edna's vehicle.  They argue that
their aiding and abetting convictions must therefore be reversed.  
After carefully reviewing the record and the relevant law, we
agree.
 To support a conviction for aiding and abetting, the
government must prove, in addition to the commission of the offense
by the principal, that the defendant "'consciously shared the
principal's knowledge of the underlying criminal act, and intended
to help the principal.'"   United States v. Spinney, 65 F.3d 231,
235 (1st Cir. 1995) (quoting United States v. Taylor, 54 F.3d 967,
975 (1st Cir. 1995)).  We have stated that the defendant's
knowledge must be more than merely a "'general suspicion that an
unlawful act may occur.'"  United States v. Loder, 23 F.3d 586, 591
(1st Cir. 1994) (quoting United States v. Labat, 905 F.2d 18, 23
(2d Cir. 1990)).  However, we have also recognized the difficulty
of precisely articulating the degree of knowledge required to
support a conviction for aiding and abetting particular offenses.  
See, e.g., Spinney, 65 F.3d at 236-40 (discussing the "continuum"
of mens rea requirements for aiding and abetting).
 In Spinney, for example, we held that a conviction for
aiding and abetting an armed bank robbery must be supported by
evidence that the defendant was "on notice of the likelihood" that
the principal would use a dangerous weapon in the commission of the
bank robbery.  See id. at 240.  By contrast, we held that a
conviction under 18 U.S.C.  2 & 924(c) for aiding and abetting
the use of a firearm in a crime of violence required proof that the
defendant knew "to a practical certainty" that the principal would
be using a gun.  See id. at 238-39.  Although we were not explicit,
a fair reading of Spinney supports the proposition that the level
of knowledge required to support an aiding and abetting conviction
is related to the specificity of the principal offense, as to both
mens rea and actus reus.
 Not surprisingly, appellants urge us to adopt the higher
"practical certainty" standard referred to in Spinney.  However, we
need not decide that issue today.  Even under a less exacting
"notice of likelihood" standard, we conclude that no reasonable
jury could have found appellants Rosario-Daz and Montalvo-Ortiz
guilty beyond a reasonable doubt of aiding and abetting the
carjacking of Edna Rivera-Hernndez.
 The United States argues that Rosario-Daz and Montalvo-
Ortiz should have known that Aponte-Laz and his cohorts might
choose a carjacking as a way to execute their contract on Edna,
because Rosario-Daz (in the presence of Montalvo-Ortiz) gave
Aponte-Laz the make and model of Edna's car, as well as some of
the numbers from her license plate.  The government also argues
that, at the very least, Rosario-Daz and Montalvo-Ortiz had
knowledge that a carjacking was likely when they directed Aponte-
Laz to the doctor's office and Aponte-Laz opined that such
circumstance would facilitate the crime because it would avoid the
need to go to Edna's house.
 Before directly addressing the sufficiency of the factual
evidence in this case, we would note that carjacking is a
specialized offense, requiring a specific criminal act and a narrow
mens rea.  Rather than criminalizing any offense that involves a
vehicle, Congress chose in 18 U.S.C.  2119 to create federal crime
only where the vehicle is "taken" by force and violence or by
intimidation.  As the Supreme Court held last term in  Holloway v.
United States, 119 S. Ct. 966, 970 (1999), the mental state
required by the statute ("intent to cause death or serious bodily
harm") is measured at the moment that the defendant demands or
takes control of the vehicle.  The focus of the statute is narrow.
 When viewed in the light most favorable to the
prosecution (as indeed we must view all evidence for these
purposes), the evidence pointed to by the United States might
fairly be deemed to raise a possibility that Aponte-Laz would
commit a carjacking.  However, viewed in any light, we simply do
not find that evidence to raise such a possibility to the level of
a probability or a likelihood.  Based on the instructions and
information that Rosario-Daz and Montalvo-Ortiz provided to
Aponte-Laz, any of several scenarios were within the realm of
possible means of confronting Edna and attempting to retrieve the
$200,000--burglary, confronting her near her home, confronting her
on the street, confronting her at her car without attempting to
"take" the vehicle, confronting her in connection with a
carjacking, et cetera.  It is noteworthy that, in addition to
information about Edna's car, Rosario-Daz gave Aponte-Laz her
home address as well as the location of her school.  In other
words, Aponte-Laz was given information by which he might locate
Edna at any time during the morning, day, or night, at any of the
places that she could be foreseen to be--at home, at school, or
elsewhere with her car.  Significantly, the jury was not presented
with a single discussion or instruction in which Rosario-Daz or
Montalvo-Ortiz mentioned or even alluded to a carjacking.   In sum,
we find no evidence whatsoever in the record that could reasonably
be considered by the jury to make carjacking more likely than any
of the other possible ways in which Aponte-Laz could have carried
out Rosario-Daz and Montalvo-Ortiz's instructions.  Where the
offense actually committed by the principal is merely one of many
(in this case, practically innumerable) possibilities, we see no
difference between such "knowledge" and a "general suspicion" that
a criminal act is underway or contemplated.
 Because there was insufficient evidence in the record for
the jury to reasonably find that Rosario-Daz and Montalvo-Ortiz
had the requisite foreknowledge that a carjacking would be
committed, we must reverse their conviction on Count One of the
indictment.
 2.  Count Two
 Appellants argue that their lack of foreknowledge should
also defeat their convictions on Count Two.  We agree.
 As we have held many times, "[t]o prove the elements of
a conspiracy, the government must show beyond a reasonable doubt
that the 'defendant and one or more coconspirators intended to
agree and . . . to commit the substantive criminal offense which
was the object of their unlawful agreement.'"  United States v.
Escobar-de-Jess, 187 F.3d 148, 175 (1st Cir. 1999) (quoting prior
cases from this Circuit); see also Salinas v. United States, 118 S.
Ct. 469, 477 (1997) ("A conspirator must intend to further an
endeavor which, if completed, would satisfy all of the elements of
a substantive criminal offense . . . .").  Viewing the evidence
presented at trial in the light most favorable to the government,
that evidence is insufficient to prove that Rosario-Daz and
Montalvo-Ortiz agreed to commit or intended to further a
carjacking.  No reasonable jury could have convicted them of such
a conspiracy, and we reverse their convictions on Count Two of the
indictment.
 We take no pleasure in reversing the convictions of two
appellants who were proven at trial to be the instigators of a
nefarious criminal scheme that led to the brutal rape and murder of
a young woman.  The evidence produced at trial left no reasonable
doubt that Rosario-Daz and Montalvo-Ortiz conspired with Aponte-
Laz to rob and, if necessary, to murder Edna.  Appellants were
never charged with such a conspiracy, however, and we are powerless
to undo that prosecutorial judgment.  It is not unusual in this day
and age for the federal government to prosecute narrow parts of
criminal enterprises that would more logically (when viewed as a
whole) be adjudicated in local courts.  Indeed, the greater
resources available to the federal government, at the investigatory
and prosecutorial stages, often counsel in favor of such an
approach.  Nevertheless, and irrespective of the hideous nature of
the crimes committed, a court of law is required to make its
rulings on principled grounds.  There are no such grounds for a
ruling in the United States's favor on this issue, given the facts
proven by the prosecution, and therefore cannot sustain appellants
Rosario-Daz and Montalvo-Ortiz's convictions on Counts One and
Two.
 B.  Melndez-Garca and Bez-Jurado
 The joint brief filed by appellants Melndez-Garca and
Bez-Jurado raises several issues on appeal, several of which are
applicable to and joined by more than one appellant in this case.  
We will address the broadly applicable issues first, and then
proceed to the appellant-specific issues.
 1.  Improper Bolstering by Agent Huff
 Appellants argue that the testimony of FBI Agent Daryl
Huff constituted improper bolstering of the testimony of
cooperating witness Aponte-Laz.  We review the district court's
admission of the challenged testimony under a harmless error
standard.  See United States v. Josleyn, 99 F.3d 1182, 1198 (1st
Cir. 1996).  Although we are troubled by Huff's testimony, we hold
that its admission was harmless error.
 The case law is clear, and the parties agree, that
prosecutors may not place the prestige of the United States behind
a witness by making personal assurances about the credibility of a
witness or by indicating that facts not before the jury support the
witness's testimony.  See, e.g., United States v. Neal, 36 F.3d
1190, 1207-08 (1st Cir. 1994).  It is also undisputed that the
prosecution cannot accomplish such improper bolstering of a witness
through the testimony of other government witnesses.  See United
States v. Mazza, 792 F.2d 1210, 1214-16 (1st Cir. 1986).  
Government witnesses may of course testify to facts within their
personal knowledge that support or corroborate another witness's
testimony.  Indeed, in a case such as this one, where the bulk of
critical testimony comes from a single cooperating coconspirator,
the prosecution's principal task is often to convince the jury that
the witness's account is credible.  The prosecution simply must do
so through competent and reliable evidence and not through improper
vouching that could invite the jury to find guilt on the basis of
something other than the evidence presented at trial.
 We have no difficulty concluding that the testimony of
Agent Huff was improper.  Although Huff could properly have
testified as to the actions he took to corroborate Aponte-Laz's
testimony, we think it obvious that he could not properly opine on
whether particular statements by Aponte-Laz were "lies," nor could
he represent that the statements not singled out as lies had been
"tested" and verified through interrogation techniques.  
Particularly in light of Huff's testimony concerning his training
and experience in interrogation and investigation, the clear
purpose and effect of his testimony was to put the prestige of his
professional knowledge as a federal agent behind the testimony of
Aponte-Laz.  That is the very definition of improper bolstering,
and it is impermissible.
 Nevertheless, we believe that this case is
indistinguishable from United States v. Piva, 870 F.2d 753 (1st
Cir. 1989), in which we held that it was not reversible error to
admit the testimony of a law enforcement officer detailing out-of-
court statements by the defendant.  The Piva panel distinguished
our decision in Mazza using words that are equally applicable to
the case presently under consideration:
   [T]he testimony of [the officer] was admitted
 after [defendant's] testimony, whereas in
 Mazza the agents' testimony came at the
 opening of trial.  Thus we are not faced here
 with the Mazza danger that the agent would
 testify as to items that would never come into
 evidence, nor would [defendant's] testimony be
 bolstered by the law enforcement officer
 before the jury could evaluate it
 independently.  Furthermore, the government
 was justified in seeking admission of this
 testimony because of the defense's attacks on
 the informant's credibility.

Id. at 760.  In this case, Aponte-Laz testified extensively before
Agent Huff took the stand, and Aponte-Laz was subject to vigorous
cross-examination.  Furthermore, the district court took pains to
instruct the jury that they were to judge Aponte-Laz's credibility
on the basis of his testimony alone, and not that of Agent Huff.  
On these facts, and in light of the other probative evidence
admitted in this case, we hold that the improper bolstering
solicited by the prosecution from Agent Huff was harmless error not
warranting reversal.  We nevertheless take this occasion to issue
a strong warning against the use of this procedure by government
prosecutors and advise that they will tread on thin ice indeed if
they continue to practice this technique in the future.
 2.  Denial of Motion for New Trial
 Appellants next argue that the district court erred in
denying a motion for a new trial submitted by appellants after
their convictions.  We affirm the district court's ruling.
 The day after the guilty verdict was returned in this
case, the victim's father gave an interview on local television.  
In that interview, Edna's father stated that an FBI agent had told
him that the FBI had investigated and found no link between Edna
and the defendants or the $200,000 of alleged drug money.  Because
this assertion ran directly contrary to the government's theory at
trial and apparently contradicted the testimony of Aponte-Laz that
Edna had admitted having the money but claimed to have returned it,
appellants Rosario-Daz and Montalvo-Ortiz filed a motion for a new
trial alleging Brady violations and the discovery of new evidence.  
All appellants joined the motion.
 After receiving briefs, conducting a hearing, and
reviewing the statement of Edna's father, the trial court denied
the motion for a new trial on August 6, 1998.  See Opinion and
Order of August 6, 1998.  After examining the relevant law, the
trial court determined that the agent's statement to Edna's father
would be inadmissible (and in any event immaterial) lay opinion and
thus was neither discoverable under Brady nor "newly discovered
evidence" warranting a new trial under Federal Rule of Criminal
Procedure 33.  See id. at  18-21.
 We review the denial of a motion for a new trial for
abuse of discretion.  See United States v. Montilla, 115 F.3d 1060,
1064 (1st Cir. 1997).  We also note that a new trial is generally
warranted only in the rare circumstance where retrial is necessary
to prevent a miscarriage of justice.  See United States v.
Gonzlez-Gonzlez, 136 F.3d 6, 12 (1st Cir. 1998).  After carefully
reviewing the record and the law, we hold that the district court
did not abuse its discretion in denying the motion for a new trial.
 First, the agent's statement to the victim's father
cannot itself warrant a new trial.  Because it was made after
trial, the prosecution cannot be faulted for failing to produce it
as Brady material.  Even if a new trial were granted, the agent's
statement might very well be excluded as inadmissible hearsay or,
as the district court opined, inadmissible lay opinion testimony.  
Moreover, even if admitted, the testimony is to a lack of evidence,
not to some talismanic piece of evidence affirmatively proving or
disproving a connection.  Its probative value, therefore, would be
questionable.
 Second, we do not agree with appellants' implicit
contention that the agent's statement necessarily indicates that
the prosecution possessed other exculpatory evidence at the time of
trial.  Again, the agent's alleged statement was that the FBI had
failed to establish a connection between Edna and the drug
operation.  We decline to speculate that the government had
affirmatively disproved any connection, and we certainly should not
and will not require the prosecution to report back to the defense
every time an investigation fails to produce the results that the
government intended.   
 Third, we agree with the district court that appellants'
motion for a new trial failed to demonstrate a sufficient
likelihood that the "evidence" derived from the statement would
change the outcome of the trial.  At best, the information would
allow the defense to (1) impeach Aponte-Laz's testimony that Edna
had admitted having and returning the drug money and (2) dispute
the alleged motive for carjacking Edna--to retrieve the $200,000.  
As the United States points out, Edna's connection to the
defendants or to the money is not an element of any crime charged
nor an alleged overt act of the conspiracy.  Furthermore, whether
or not Edna was in fact involved with the drug operations is
ultimately irrelevant to appellants' guilt for carjacking and
killing her.
 Under the circumstances, we conclude that the district
court did not err in denying the motion for a new trial.
 3.  Sufficiency of the Evidence
 Appellants argue that the evidence submitted at trial was
insufficient to sustain the jury's guilty verdicts against them,
because the inculpatory evidence presented at trial consisted
almost exclusively of the testimony of cooperating witness Aponte-
Laz.  Appellants argue that Aponte-Laz's testimony is
unbelievable because Aponte-Laz admitted to lying to agents and
others at various times and because of Aponte-Laz's history of
criminal behavior.  Again, we review a district court's Rule 29
determinations de novo.  See United States v. Hernndez, 146 F.3d
30, 32 (1st Cir. 1998).
 Appellants correctly note that we have held the
uncorroborated testimony of a cooperating accomplice sufficient to
sustain a conviction, unless that testimony is facially incredible.  
See United States v. Andjar, 49 F.3d 16, 21 (1st Cir. 1995).  
Aponte-Laz's testimony in this case was not facially incredible.  
It is true that, given the circumstances surrounding the crimes
committed, Aponte-Laz's participation therein, and his obvious
motive to testify favorably for the government, Aponte-Laz's
credibility was subject to challenge.  This, however, was
vigorously done by appellants at every opportunity during trial,
before those charged with weighing credibility--the jury.  
Appellants offer us no basis for determining that the jury's
credibility determination is unsupportable other than the evidence
that the jury itself considered and rejected.  Because Aponte-
Laz's testimony is not facially unbelievable, we hold that his
testimony alone provided the jury with enough evidence to support
the convictions of Melndez-Garca, Bez-Jurado, and Lpez-Morales.  
Furthermore, the evidence against Melndez-Garca and Bez-Jurado
included their own inculpatory statements to law enforcement.  
Consequently, we decline to reverse the convictions of Melndez-
Garca, Bez-Jurado, or Lpez-Morales on sufficiency-of-the-
evidence grounds.
 4.  Improper Sentence Imposed for Conspiracy Conviction
 Next, appellants have joined the argument, best
articulated in the brief of appellants Rosario-Daz and Montalvo-
Ortiz, that the district court erred in imposing life sentences for
appellants' convictions on Count Two, which charged them with
conspiracy in violation of 18 U.S.C.  371.  The United States
concedes that 18 U.S.C.  371 provides for imprisonment of "not
more than five years."  The district court clearly erred in
imposing life sentences on Count Two, and we vacate the sentences
of Melndez-Garca, Bez-Jurado, and Lpez-Morales on Count Two and
remand for resentencing.
 5.  Unfair Prejudice from Evidence Against Other     
      Defendants

 Finally, appellants jointly argue that the substantial
evidence admitted against other defendants, particularly Rosario-
Daz and Montalvo-Ortiz, unfairly prejudiced them by allowing the
jury to convict them on the basis of evidence relating to other
defendants' conduct.  In essence, appellants challenge the district
court's denial of their requests for severance.  We conclude that
there was no reversible error.
 At trial, the United States offered a great deal of
testimony detailing the drug trafficking activities of defendants
Rosario-Daz and, to a lesser extent, Montalvo-Ortiz.  The
government did not allege nor prove that the other defendants were
involved in those illegal activities.  Appellants now argue that
the evidence against Rosario-Daz and Montalvo-Ortiz improperly
affected the jury's verdicts, and they request that we reverse
their convictions.
 We have recognized this kind of "spillover" claim before.  
See, e.g., United States v. Drougas, 748 F.2d 8, 18-19 (1st Cir.
1984).  In Drougas we stated that, "[i]n a case involving several
defendants, the court must take care that evidence against one
defendant is not misinterpreted by the jury and used as a basis for
convicting another defendant not connected to that evidence."  Id.
(citing United States v. Flaherty, 668 F.2d 566, 582 (1st Cir.
1981).  After stating that the district court's severance
determinations should be overturned only upon a showing of strong
prejudice, see id., we nevertheless concluded that the trial
court's careful instructions to the jury and the ample evidence
against the defendant eliminated any possibility of unfair
prejudice.
 We likewise conclude that the admission of the drug-
related evidence in this case was not an abuse of discretion.  The
evidence of Rosario-Daz's drug trafficking was clearly relevant in
that it connected Rosario-Daz to Edna, supported the government's
theory on motive, and corroborated the critical testimony of
Aponte-Laz.  The drug trafficking evidence can also be viewed as
necessary to complete the story of the conspiracy and carjacking
charged in this case, in that drugs are the common denominator
linking the various characters.
 Moreover, there was ample evidence admitted against each
appellant to reduce the risk of an unfounded guilty verdict.  As
discussed above, the government presented substantial evidence of
guilt, primarily through the testimony of Aponte-Laz but also, at
least in the cases of Melndez-Garca and Bez-Jurado, through the
appellants' own inculpatory statements to investigators.  Although
the record does not reflect the extensive corrective instructions
given to the jury in Drougas, we nevertheless hold that the
evidence of drug trafficking in this case did not create a
sufficient risk of unfair prejudice to warrant reversal and
severance.
 6.  Melndez-Garca's Waiver of Rights and Consent to  
      Search

 Turning now to the appellant-specific arguments raised in
appellants' joint brief, we consider first the issues raised by
appellant Melndez-Garca.  Melndez-Garca first argues that her
statements to the FBI and the evidence recovered in the search of
her residence should have been suppressed because her waivers were
not "knowing and intelligent" and because her statements and
consent to search were not voluntary.  After reviewing the record,
we conclude that there was no error in the admission of this
evidence.
 We review the district court's rulings on these issues
for clear error.  See United States v. Cardoza, 129 F.3d 6, 13 (1st
Cir. 1997) (Fourth Amendment challenge); United States v. Santos,
131 F.3d 16, 18 (1st Cir. 1997) (Fifth Amendment challenge).
 The question before the district court was whether the
government demonstrated by a preponderance of the evidence, see
Colorado v. Connelly, 479 U.S. 168 (1986), that Melndez-Garca's
waiver and consent were both "voluntary in that [they] were the
product of a free and deliberate choice rather than intimidation,
coercion and deception" and also made with "full awareness of both
the nature of the right being abandoned and the consequences of the
decision to abandon," Moran v. Burbine, 475 U.S. 412, 420 (1986).  
The court's determination must be made in light of "the totality of
the circumstances and the facts surrounding the particular case
including the background experience and conduct of the accused."  
United States v. Garca, 983 F.2d 1160, 1169 (1st Cir. 1993).
 Melndez-Garca admits to signing a written waiver of her
Miranda rights and a written consent to search her residence.
However, she claims that the district court could not have properly
found her waiver of her Fourth and Fifth Amendment rights to be
knowing and intelligent and voluntary, based on the evidence that
she has a very low I.Q. and that she was interviewed by law
enforcement over a period of some six hours.
 The trial court received a substantial amount of evidence
regarding Melndez-Garca's mental capacity, including expert
testimony from both sides.  Although the court received evidence
that Melndez-Garca's I.Q. was in the middle 70s and that she had
no prior involvement with the criminal justice system, the court
also heard testimony from an arresting officer and the government's
expert witness that Melndez-Garca understood what was happening
when she waived her Fifth Amendment rights and consented to the
search.
 The district court also received evidence relating to the
voluntariness of Melndez-Garca's decisions.  Although Melndez-
Garca herself testified that she felt very scared and physically
ill, there was no evidence whatsoever of physical coercion or
intimidation, nor was there any indication of conduct by the law
enforcement agents that would amount to psychological coercion or
intimidation.
 Viewing the totality of the circumstances particular to
this case, we cannot conclude that the district court clearly erred
in its determination that Melndez-Garca's waiver and consent were
knowing and intelligent and made voluntarily.  We therefore affirm
the district court's decision on this issue.
 7.  Denial of Downward Departure
 Appellant Melndez-Garca also argues that the district
court should have awarded her a downward departure under  5K2.13
of the Sentencing Guidelines.  On appeal, she suggests that the
court should have taken into consideration both her diminished
mental capacity and her role in caring for Edna's baby after the
crime.
 We first note that a district court's decision not to
depart from the Sentencing Guidelines is ordinarily not appealable
unless the record indicates some error of law such as a
misapprehension of the applicable guideline or a miscalculation of
the sentencing court's authority.  See United States v.
Grandmaison, 77 F.3d 555, 560 (1st Cir. 1996).  Appellant points to
no such legal error in the record, arguing instead that the
district court simply denied her a departure to which she was
entitled.  We are therefore without jurisdiction to review the
district court's refusal to grant a departure.
 8.  Voluntariness of Bez-Jurado's Statements to  
   Investigators

 The final issue raised by appellant Bez-Jurado is a
challenge to the admission into evidence of his inculpatory
statements to investigators the day following his detention.  
Although the trial court's determination of voluntariness is
subject to de novo review, its factual findings are reviewed for
clear error.  See United States v. Santos, 131 F.3d 16, 18-19 (1st
Cir. 1997).  Because we conclude that the statements were
voluntary, we affirm the admission of the statements at trial.
 Bez-Jurado's principal contention is that he was
detained for twenty-eight hours before being brought before a
magistrate, and that the government's proffered reasons of
administrative delay and unavailability of a magistrate are not
credible.  However, Bez-Jurado does not point to any evidence of
physical or psychological coercion by law enforcement, nor does he
specify how the delay in his initial appearance rendered his
confession involuntary.  Furthermore, delay in appearing before a
magistrate is only one of several factors to be considered in
determining voluntariness.  See 18 U.S.C.  3501(b) (listing
several illustrative and nonconclusive factors).  None of the other
factors suggesting involuntariness have been shown.  Consequently,
we find no error in the district court's determination that the
statements were admissible.
 C.  Lpez-Morales
 In addition to the arguments addressed above, appellant
Lpez-Morales challenges the district court's admission of two
types of evidence.
 1.  Evidence of Plan to Kill Government Witnesses
 At trial, the government presented evidence, through the
testimony of Aponte-Laz, that Aponte-Laz and Lpez-Morales agreed
to a plan by which Aponte-Laz would exonerate Lpez-Morales to the
authorities so that Lpez-Morales would be released and then murder
witnesses expected to testify for the government.  Lpez-Morales
now argues that this evidence was irrelevant, unfairly prejudicial,
and that its admission implicitly amended the indictment in
violation of the Grand Jury Clause of the Fifth Amendment.  We
generally will reverse a district court's admissibility
determinations under Federal Rules of Evidence 402 and 403 only in
extraordinarily compelling circumstances, see United States v.
Brandon, 17 F.3d 409, 443 (1st Cir. 1994), although we consider
Lpez-Morales's constitutional challenge de novo.
 First, we find the evidence of the plot to be plainly
relevant to Lpez-Morales's guilt in the carjacking, insofar as it
evinces a consciousness of guilt.  See United States v. Gonsalves,
668 F.2d 73, 75 (1st Cir. 1982).  Likewise, we cannot find that the
district court abused its discretion in admitting the evidence
under Federal Rule of Evidence 403.  Although we agree with
appellant that the evidence is prejudicial to his defense in a
generic sense (as is all probative evidence of guilt), we are not
persuaded that it was unfairly so.  The jury had every opportunity
to weigh Aponte-Laz's testimony, and, once accepted, that
testimony was properly held against Lpez-Morales.
 Lpez-Morales's Fifth Amendment argument is more
substantial.  As we recognized in United States v. Dunn, 758 F.2d
30, 35 (1st Cir. 1985), the admission of evidence of an offense not
charged in the indictment can, in some circumstances, constitute
grounds for reversal of a conviction.  See also Stirone v. United
States, 361 U.S. 212 (1960).  The Grand Jury Clause of the Fifth
Amendment guarantees that no person shall be tried and convicted of
a crime in federal court lest his fellow citizens have seen fit to
charge him with such crime.  If the court permits the jury to
convict a defendant on evidence of a crime not included in the
indictment, that constitutional right is violated.  See id. at 273
(quoting Ex parte Bain, 121 U.S. 1, 10 (1887)).
 This important rule, however, is not as broad as
appellant would have us proclaim.  Although an indictment may not
be constructively amended by presenting evidence of uncharged
offenses, there are many instances in which evidence of uncharged
conduct is properly admitted in a criminal trial.  Rule 404(b) of
the Federal Rules of Evidence, for instance, states that evidence
of uncharged crimes, wrongs, or acts may be admitted to prove
"motive, opportunity, intent, preparation, plan, knowledge," etc.  
Such evidence, because ultimately offered to prove guilt of the
charged offense, effects no constructive amendment of the
indictment and therefore does not infringe on a defendant's Fifth
Amendment rights.  Likewise, in this case the United States offered
evidence of the plan to kill government witnesses for a number of
legitimate reasons aimed ultimately at proving the charged
offenses, including to prove consciousness of guilt and to explain
the inconsistency between Aponte-Laz's initial exoneration of
Lpez-Morales and his subsequent change in testimony.  We find no
constructive amendment of the indictment and no reversible error.
 2.  Evidence of Rape
 The United States also presented the jury with evidence
that Lpez-Morales participated in the rape of Edna before she was
murdered.  Lpez-Morales argues that this evidence should have been
excluded as irrelevant or, at least, as unfairly prejudicial,
because rape was not an element of the offense charged--carjacking
that resulted in death, under 18 U.S.C.  2119(3).  Again, we
reverse a district court's Rule 402 and 403 determinations only
rarely and only upon demonstration of extraordinary circumstances.  
See Brandon, 17 F.3d at 443.
 The trial judge did not abuse his discretion in admitting
the evidence of rape in this case.  There can be no reasonable
dispute that the rape evidence was inseparably intertwined with the
carjacking and murder, and the evidence presented to the jury was
necessary to complete the story of the crime charged in the
indictment, even though that indictment charged appellant with a
carjacking that resulted in death rather than the lesser crime of
a carjacking resulting in bodily injury.  Although the evidence was
certainly powerful, there was no error in the trial judge's
determination that its probative value was not substantially
outweighed by any possibility of unfair prejudice.  Cf. Fed. R.
Evid. 403.
                        III.  CONCLUSION
 In conclusion, the convictions of appellants Rosario-Daz
and Montalvo-Ortiz must be reversed for insufficiency of evidence.  
The convictions of appellants Melndez-Garca, Bez-Jurado, and
Lpez-Morales are affirmed, although we must vacate their sentences
on Count Two of the indictment and remand to the district court for
resentencing.
 Affirmed in part, reversed in part.

</body>

</html>